IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                            :
VINCENT J. CIECKA, et al.,  :      HON. JEROME B. SIMANDLE
                            :
            Plaintiffs,     :      Civil No. 12-3043 (JBS/AMD)
                            :
    v.                      :
                            :            OPINION
LANCE S. ROSEN, et al.,     :
                            :
            Defendants.     :
                            :
```

APPEARANCES:

Michael Sussen, Esq.
Joseph John Urban, Esq.
5709 Westfield Avenue
P.O. Box 560
Pennsauken, NJ 08110
    Attorneys for Plaintiffs

Jeffrey B. McCarron, Esq.
Swartz, Campbell LLC
Two Liberty Place
50 S. 16th Street, 28th Floor
Philadelphia, PA 19102
    Attorney for Defendants

**SIMANDLE**, Chief Judge:

## I. Introduction

Before the Court are Plaintiffs' motion to remand [Docket Item 4] and Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6) [Docket Item 3].

This case arises from a dispute between two law firms who successively represented a personal injury client on the same matter. Plaintiffs Vincent J. Ciecka and his law firm, the Law Offices of Vincent J. Ciecka, P.C., represented Joseph Conway on

a workers' compensation case and a personal injury suit against a third-party tortfeasor, until Conway terminated his relationship with Plaintiffs and retained Defendants Lance Rosen, Esq., and his law firm, Rosen, Moss, Snyder & Bleefeld, LLP, to take over the matters. Defendants settled all of Conway's claims. Plaintiffs now seek an equitable share of the fee paid to Defendants, based on the work that Plaintiffs did in preparing Conway's case. Plaintiffs also allege that Defendants tortiously interfered with their contractual relationship with Conway and tortiously interfered with prospective economic advantage after Conway discharged, and later inquired about rehiring, Plaintiffs.

Defendants removed the case to this Court, and Plaintiffs now seek remand, arguing that less than $75,000.00 is in dispute so that diversity jurisdiction under 28 U.S.C. § 1332 is not present. As explained below, because the action was removed properly and Plaintiffs may not amend their complaint now to defeat federal diversity jurisdiction, the motion to remand will be denied. Moving to the merits of the case, the Court finds that Pennsylvania law applies to the quantum meruit claim, and because Pennsylvania law does not permit such an action between successive law firms, the motion to dismiss that claim will be granted. However, Plaintiffs do state a claim for tortious interference with prospective economic advantage, and thus Defendants' motion to dismiss will be denied in part.

## II. Background

### A. Facts

On February 16, 2007, Joseph Conway, age 35, a New Jersey resident, was struck by a dumpster while working on a construction site at a downtown hotel in Philadelphia and sustained serious personal injuries.[1] [Compl. ¶¶ 6, 27; Docket Item 1.] A month later, Conway contacted Plaintiffs, who are members of the New Jersey bar having their principal office in New Jersey, and entered into a written contingency fee agreement for them to represent him for all claims related to the accident, including the workers' compensation claim. [Compl. ¶ 7.] Plaintiffs performed legal services for Conway over a period of approximately 15 months. [Compl. ¶¶ 9, 21.]

At some point, Conway started to question whether he was satisfied with his representation. His neighbor had previously been a client of Defendant Rosen and, in May 2008, Conway visited Rosen in Philadelphia to get a "second opinion" about his case. [Statement of Conway at 3.] Conway asked if Rosen could help him find someone to oversee his medications and physical therapy, and if Rosen could refer him to a surgeon. [Statement of Conway at 4.] Rosen "promise[d]" to do so. [Id. at 3, 17.] Conway later asserted that, because of the pain medication he was using, he was not "able to think straight and recognize and know what [he

---

[1] Conway is now deceased.

was] doing at or near the time [he] went to Mr. Rosen."
[Statement of Conway at 4.]

Conway decided to discharge Plaintiffs and retain Defendants
to handle the rest of his case. Rosen wrote a letter to
Plaintiffs advising that he was taking over Conway's case and
requested the case file. [Compl. ¶ 11; Compl. Ex. 1.]

Ciecka responded in writing that his firm was asserting an
attorney lien for services rendered. [Compl. ¶ 13.] Ciecka wrote
a second letter to Rosen and asserted the lien again: "I felt it
would be fair to forward these matters to you on a normal one
third referral fee basis, based on the time, effort, and expense
my office has invested in Mr. Conway's cases...Please confirm
receipt of Mr. Conway's file . . . ." [Compl. ¶ 15 (first
ellipsis in original).]

Defendants settled the workers' compensation portion of
Conway's case in November 2008, for sum of $250,000, resulting in
an attorneys' fee of $45,000. [Compl. ¶ 18.] On February 12,
2009, Plaintiffs wrote Penn National Insurance Co. and Zurich
Insurance Co. to put them on notice that were asserting a lien on
the settlements of Conway's claims. [Compl. ¶ 19.]

In October 2009, Defendant Daniel Moss alerted Plaintiffs
that the third-party portion of Conway's case settled for
$750,000, resulting in an attorneys' fee of $250,000. [Compl. ¶
20.] Moss offered Plaintiffs $10,000 as a "participatory share,"

4

which Plaintiffs rejected as being in bad faith. [Compl. ¶ 20.] Ciecka proposed that his firm's proper share was one-third of the $295,000 in total fees, or $98,333.34. [Compl. ¶ 24.]

In the end, Plaintiffs represented Conway and performed services for him from March 16, 2007, until June 13, 2008, a period of approximately 15 months. [Compl. ¶ 21.] Defendants represented Conway from June 14, 2008, to September 14, 2009, also a period of approximately 15 months. [Compl. ¶ 21.]

After the third-party portion of Conway's case settled, Plaintiffs' office manager authorized Rosen's firm to distribute settlement funds to Conway, while holding the "fee in abeyance pending the conclusion of our agreement pursuant to our participatory fees from the proceeds of this settlement." [Compl. ¶ 22.]

Months later, in June 2011, Ciecka received a phone call from Conway, inquiring about suing Rosen, who Conway said took unfair advantage of him while Conway was addicted to Oxycontin. [Compl. ¶ 25.] Plaintiffs learned from Conway that, during the pendency of his case, Conway had wanted to switch his representation back to Plaintiffs, and had asked Rosen whether he could, because he felt the case was "over [Rosen's] head." [Statement of Conway at 6.] Rosen, on at least six or seven occasions, told Conway that he could not take the case back to Plaintiffs. [Id.] Conway said that he never contacted Ciecka

5

about switching back to Plaintiffs, because he didn't believe he was "allowed to," and because Rosen said that everything was under control. [Statement of Conway at 14.]

**B. Procedural History**

Plaintiffs filed this action in New Jersey Superior Court, and Defendants removed the case pursuant to 28 U.S.C. §§ 1441 & 1446 on the basis of diversity jurisdiction. [Notice of Removal ¶ 1.] Defendants plead that Ciecka is a citizen of New Jersey, and the Law Offices of Vincent J. Ciecka, P.C., is organized, and has its principal place of business, in New Jersey. [Id. ¶¶ 6-7.] Defendants assert that Rosen, Moss, Snyder & Bleefeld LLP is organized under the laws of Pennsylvania and is a citizen of Pennsylvania [id. ¶ 8, Notice of Removal, Exh. B. ¶ 2], all Defendants are citizens of Pennsylvania, [Notice of Removal ¶ 12], and the amount in controversy exceeds $75,000. [Id. ¶ 14.]

In the complaint, Plaintiffs assert two counts for compensation based on the work they performed for Conway, the first for Conway's personal injury claim ("Count I") and the second for his workers' compensation claim ("Count II"). [Compl. ¶¶ 30-36.] Plaintiffs also assert tortious interference with the contractual relationship between Plaintiffs and Conway ("Count III"). [Compl. ¶ 37.] Plaintiffs have offered to stipulate that they are not seeking a sum of $75,000 or greater, and they would agree to cap damages in a lesser amount so that the case could be

remanded to Superior Court.

Oral argument was held on October 23, 2012. [Docket Item 11.] A few days later, Defendants informed the Court that they would not agree to the stipulated damages cap. [Docket Item 12.]

## III. Plaintiffs' Motion to Remand

### A. Arguments

Plaintiffs move to remand. [Docket Item 4.] In an affidavit, Michael Sussen, counsel for Plaintiffs, asserts "that the value of Plaintiffs' claims do not and cannot exceed $75,000.00. I hereby explicitly waive Plaintiffs' right to damages exceeding $75,000.00. I hereby assert that Plaintiffs' [sic] will not accept damages in excess of the Jurisdictional amount, even if awarded." [Id. ¶¶ 2-4.] Plaintiffs argue that, by stipulating to a damages cap, they are "clarifying" rather than "amending" their complaint.[2] [Docket Item 4-1 at 2.]

Defendants decline to stipulate to the damages cap. [Docket Item 12.] They argue that the complaint, fairly read, seeks an amount in controversy in excess of $75,000. [Def. Opp'n at 5.] Because Plaintiffs have not established to a legal certainty that the amount in controversy cannot exceed the statutory minimum,

---

[2] This distinction matters because post-removal amendments to defeat the monetary requirement of diversity jurisdiction are not permitted. See Angus v. Shiley Inc., 989 F.2d 142, 145 (3d Cir. 1993) ("[A] plaintiff following removal cannot destroy federal jurisdiction simply by amending a complaint that initially satisfied the monetary floor.").

Defendants argue that the motion to remand must be denied. [Id. at 5-6.]

**B. Discussion**

If the plaintiff does not specifically aver in the complaint that the amount in controversy is less than the jurisdictional requirement, a two-step analysis applies. Samuel-Bassett v. Kia Motors Am., Inc., 357 F.3d 392, 398 (3d Cir. 2004). First, the defendant bears the burden of proof of establishing jurisdiction, and must establish jurisdictional facts by a preponderance of the evidence. Id. at 397-98. If the defendant makes such a showing, then the court looks to whether, to a "legal certainty," the plaintiff cannot meet the minimum amount in controversy requirement based on the facts as found, and if so, the court must dismiss the case. Id. at 396-97. A plaintiff who wants to litigate in state court is free to limit its claim to avoid federal jurisdiction. See e.g., Morgan v. Gay, 471 F.3d 469, 474 (3d Cir. 2006) (discussing the same holding in St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 294 (1938)). However, a plaintiff's amendment of his or her complaint after removal will not destroy federal jurisdiction, if the complaint initially satisfied the monetary floor. Angus, 989 F.2d at 145.

Plaintiffs argue that the damages cap "clarif[ies]" rather than amends their complaint, to get around the holding in Angus. This clarification/amendment distinction emanates from dicta in

Angus itself, in which the Third Circuit stated "where a complaint is ambiguous as to the damages asserted and the controversy seems small, it is conceivable that a court justifiably might consider a subsequent stipulation as clarifying rather than amending an original pleading. There is, after all, a distinction between explaining and amending a claim." Angus, 989 F.3d at 145 n.3. In Angus, the amount in controversy was not speculative, and thus the Third Circuit did not have occasion to hold that a subsequent stipulation could defeat jurisdiction in the face of ambiguity.

Even if the dicta were controlling of this matter, the motion to remand still must be denied. Here, while the amount of damages in the complaint is undefined, the complaint is not ambiguous as to whether damages pled exceed $75,000. At minimum, Plaintiffs appear to seek one-third of the gross legal fees due Rosen Moss, or one-third of $295,000, or $98,333.34.[3] [Compl. ¶ 24.] In addition, in Count III, Plaintiffs request damages in "the full amount that Plaintiffs would be entitled to under it's

---

[3] In Count I, Plaintiffs request quantum meruit for services performed, to be calculated "on the basis of reasonable value of professional services performed on the case, based on the percentage amount Plaintiffs were entitled to under contingency fee agreement as set forth herein." [Compl. ¶ 34.] In Count II, Plaintiffs request damages "on claims being asserted . . . in matters other than the third-part [sic] action including but not limited to, the workers compensation claim." [Id. ¶ 36.] The workers' compensation fee settled for $250,000, resulting in a fee of $45,000. [Id. ¶ 18.] The third-party claim settled for $750,000, resulting in an attorneys' fee of $250,000. [Id. ¶ 20.]

[sic] contingency fee agreement of May 24, 2006, and the
reasonable value of the claim."[4] [Id. ¶ 37.] Plaintiffs assert
that the reasonable value of Conway's claim was in excess of
$2.79 million.[5] [Id. ¶ 28.] Based on Plaintiff's calculation, any
customary, reasonable contingency fee would exceed $75,000. In
addition, Plaintiffs seek punitive damages for Count III and "all
such other relief as the court deems just." [Id. ¶¶ 34, 36-37.]
Combined, these damages may well exceed $75,000.

Defendants have shown, by a preponderance of the evidence,
that the amount in controversy exceeds $75,000, and Plaintiffs
have not shown to a "legal certainty" that Plaintiffs cannot
recover that much based upon the pleadings at the time of
removal. Plaintiffs' assertion that the amount in controversy
does not and cannot exceed $75,000 comes with no explanation, no
accounting, and no further clarification of the complaint;
indeed, it contradicts the damages sought in the complaint. Thus,
the Court declines to read Plaintiffs' subsequent stipulation to

---

[4] The Court does not see any other references to a
contingency fee agreement dated May 24, 2006, or a description of
its terms. The Court also notes that May 24, 2006, predates the
accident by nearly nine months.

[5] Ciecka asserts that Conway was unemployable as a result of
his accident, and had a working life expectancy of 30 years, at
$42 per hour, resulting in a gross loss of earnings of $2.795
million. [Compl. ¶ 28.] Even considering Conway's passing in
August 2011, Plaintiff's calculation would place Conway's loss of
earnings from 2007 to 2011 at more than $372,000. A one-third
contingency fee of that reduced amount alone would meet the
amount in controversy requirement for federal jurisdiction.

damages as a "clarification" rather than an "amendment." Because pleadings cannot be amended after removal to lower the amount in controversy to defeat diversity jurisdiction, this Court cannot remand on the basis of lack of subject matter jurisdiction. The motion to remand is denied.

## III. Defendant's Motion to Dismiss

### A. Quantum meruit claims (Counts I and II)

As an initial matter, there is disagreement about whether to apply New Jersey or Pennsylvania law to these claims, which state common law claims in quantum meruit arising from Plaintiffs' performance of legal services in Conway's workers compensation and third-party tort claims, respectively.

#### i. Conflict of Laws

A federal district court applies the forum state's choice of law rules to diversity actions. Kersey v. Becton Dickinson & Co., 433 Fed. Appx. 105, 109 (3d Cir. 2011). Under New Jersey's choice of law rules, the district court must first determine whether a conflict exists between the laws of the interested states, and if there is no conflict, the forum state's law applies. Id. (quoting Rowe v. Hoffman-La Roche, Inc., 917 A.2d 767, 771 (N.J. 2007)). This determination must be made on an issue-by-issue basis. Erny v. Estate of Merola, 792 A.2d 1208, 1213 (N.J. 2002).

If there is a true conflict, New Jersey courts follow the Restatement (Second) of Conflict of Laws ("Second Restatement")

for tort claims, and apply the law of the state that has the "most significant relationship" to the case. P.V. ex rel. T.V. v. Camp Jaycee, 962 A.2d 453, 460 (N.J. 2008) ("Although continuing to denominate our standard as a kind of governmental interest test, we now apply the Second Restatement's most significant relationship standard in tort cases.")

For contract claims, the standard is less precise. See Robert E. Bartkus & Elizabeth J. Sher, New Jersey Federal Civil Procedure 578-79 (2012) ("There are several articulated tests for determining which forum's law applies and variations on those tests. . . . New Jersey courts tend to approach the question generally in terms of the Restatement factors with attention paid to the weight of different forums' interests.") See also Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co., 629 A.2d 885 (N.J. 1993) (conducting a "flexible approach," based on the factors articulated in § 188 and § 193 of the Second Restatement, for a casualty contract claim, to determine the state with the "most significant relationship to the parties and the transaction."); Maertin v. Armstrong World Indus., Inc., 241 F. Supp. 2d 434 (D.N.J. 2002) (concluding that New Jersey employs a "flexible 'governmental interest' approach which focuses on the state that has the most significant connections with the litigation" for contract claims, quoting Gilbert and State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 417 A.2d 488 (N.J.

12

1980)). Courts treat quasi-contract claims the same as contract claims, for conflict of laws purposes, and thus should begin by considering factors set forth in § 188 of the Second Restatement. Accord Payne v. FujiFilm U.S.A., Inc., No. 07-385, 2010 WL 2342388, at *10 (D.N.J. May 28, 2010) (conducting a conflict analysis under New Jersey law and stating "the Court will apply Section 188 of the Restatement (Second) of Conflict of Laws to Plaintiff's claims sounding in contract or quasi-contract.")

**ii. Whether a conflict exists for quantum meruit claims**

Both parties assert that the laws of New Jersey and Pennsylvania do not conflict, however, they disagree about whether this kind of action for quantum meruit is cognizable at all. Defendants argue that, under either Pennsylvania or New Jersey law, attorney or law firm plaintiffs cannot maintain an action for quantum meruit against an unrelated, successor attorney or law firm. [Def. Br. at 7.] Plaintiffs, seizing on the "conce[ssion]" by Defendants that laws do not conflict, assert that the Court therefore should apply the law of the forum state, New Jersey, which Plaintiffs argue permits quantum meruit actions of this kind. [Pl. R. Br. at 5.] It is uncontested that both New Jersey and Pennsylvania permit quantum meruit actions against former clients.

The laws of New Jersey and Pennsylvania conflict on whether an attorney or law firm may maintain an action for quantum meruit

13

against an unrelated, successor attorney or law firm for a portion of a contingency fee. New Jersey courts clearly permit such actions. See, e.g., Haremza v. GMAC Ins. Co., No. 15095-09, 2011 WL 2348727, at *2 (N.J. Super. Ct. App. Div. June 9, 2011) ("Where a client terminates an attorney's representation prior to the resolution of the underlying matter, that attorney may see the equitable remedy of quantum meruit for work performed prior to termination. . . . This doctrine also permits the recovery of a share of a subsequently realized contingent fee."); Bruno v. Gale, Wentworth & Dillon Realty, 852 A.2d 198 (N.J. Super. Ct. App. Div. 2004) (discussing the factors to consider in an action to share a contingent fee between successive attorneys and remanding the case for a plenary hearing); La Mantia v. Durst, 561 A.2d 275, 276 (N.J. Super. Ct. App. Div. 1989) (entertaining an action to share a contingency fee between two law firms); Buckelew v. Grossbard, 461 A.2d 590, 591-92 (N.J. Super. Ct. Law Div. 1983) (splitting a contingency fee between successive counsel in a medical malpractice action). Pennsylvania law, on the other hand, does not permit such a cause of action. See, e.g., Styer v. Hugo, 619 A.2d 347, 352 (Pa. Super. Ct. 1993), aff'd 637 A.2d 276, (Pa. 1994) (holding that an attorney who initially represents a client and is dismissed does not have a quantum meruit action against the attorney who ultimately settles the case); Mager v. Bultena, 797 A.2d 948, 955 (Pa. Super. Ct.

2002) (following <u>Styer</u>, holding that a law firm's claim for counsel fees lies only against its client); <u>Labrum & Doak, LLP v. Brown</u> (<u>In re</u> Labrum & Doak), 225 B.R. 93, 105-06 (Bankr. E.D. Pa. 1998) ("Pennsylvania law is clear that a <u>quantum meruit</u> cause of action does not lie against an unrelated successor attorney").[6]

In this case, Plaintiffs and Defendants are unrelated, successive attorneys, and Plaintiffs seek to share the fee earned after Conway terminated his client relationship with Plaintiffs. Because New Jersey courts permit such an action and Pennsylvania courts do not, a true conflict exists. Therefore, the Court must determine which state has the most significant relationship to the quasi-contract claims seeking quantum meruit.

### iii. Analysis of the quantum meruit conflict

Defendants argue that Pennsylvania has the greatest interest in the action, because Defendants are Pennsylvania lawyers, the claims arise out of Defendants' representation of Conway in Pennsylvania, the injury giving rise to Conway's injuries took place in Pennsylvania, and Pennsylvania "has a greater interest in the extent to which dismissed attorneys are entitled to compensation for their representation of clients in litigation in Pennsylvania." [Def. Br. at 6.]

---

[6] Some Pennsylvania cases permit quantum meruit recovery when the original and successor attorneys had an employer-employee relationship, however no such relationship exists between the parties here.

Plaintiffs, at oral argument, asserted that New Jersey has the most significant relationship, because the matter arises out of legal services performed in New Jersey by a New Jersey law firm for a New Jersey client, based on a New Jersey contingency fee agreement.

The Court will begin by considering factors set forth in § 188(2) of the Second Restatement: "(a) place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." Section 196 ("Contracts For The Rendition Of Services") further directs that the law of the state "where the contract requires that the services, or a major portion of the services, be rendered" shall apply, unless some other state has a more significant relationship.

These factors are not particularly helpful when considering this quasi-contract action. Although Plaintiffs attempted to reach an agreement with Defendants regarding sharing any fees, and alerted Defendants that they were asserting a lien on the settlements, these parties never negotiated or signed a contract with each other, and they are citizens of different states and each negotiated agreements with Conway, and performed services for him, in their respective states. Thus, the Court must look at

16

additional factors to determine which state has the most significant relationship to this matter.

The Court finds that Pennsylvania has the most significant relationship to these claims. The only reason these claims exist is because Defendants settled Conway's case, resulting in a fee that Plaintiffs now seek to divide. To put it another way, Plaintiffs could not share a fee that was never awarded; only because the former client settled the case - in Pennsylvania, under the guidance of Pennsylvania counsel - giving rise to attorneys' fees, do Plaintiffs now seek a portion of the fee. Although Plaintiffs performed services for a New Jersey client in New Jersey, Plaintiffs were not entitled to any compensation for that work, according to the contingency fee agreement, until and unless the matter settled or the client won in court. Here, the settlements triggered Plaintiffs' claims.

The settlements in this case were negotiated in Pennsylvania, under Pennsylvania law, by a Pennsylvania law firm, to resolve a claim concerning an injury that occurred in Pennsylvania. A workers' compensation judge in Pennsylvania approved the workers' compensation settlement, which was based on a Pennsylvania policy arising from Pennsylvania employment of the client/decedent for injuries at a Pennsylvania workplace accident. The third-party action settled after Defendants filed the claim in a Pennsylvania court. The fees that Plaintiffs seek

to split were paid pursuant to a fee agreement that was negotiated and signed in Pennsylvania. Without the legal work conducted in Pennsylvania or the settlements that were accomplished there by Pennsylvania lawyers, no claim against Defendants would exist here. Pennsylvania certainly has an interest in protecting its lawyers from sharing its fees with previously terminated lawyers from out of state.

Plaintiffs argue unpersuasively that the cause of action stems from a New Jersey contingency fee agreement, which weighs in favor of applying New Jersey law. When Conway discharged Plaintiffs, the contingency fee agreement that had existed between Conway and Plaintiffs lost legal significance. What Plaintiffs seek is compensation for the work they performed for Conway, which contributed to the eventual settlement. There is no doubt that Plaintiffs were motivated to perform that work because of the contingency fee agreement they had in place, but the cause of action here relates to the actual services Plaintiff provided, not the agreement itself. While Plaintiffs' contingent agreement would govern a claim against Conway or his estate, no such claim is asserted here. Therefore, the New Jersey contingency fee agreement does not weigh in favor of applying New Jersey law.

Plaintiffs also argue that New Jersey, by enacting the Attorney's Lien Act, N.J. Stat. Ann. § 2A:13-5, expresses a policy of protecting New Jersey law firms and their clients from

18

wrongful conduct of out-of-state attorneys. [Pl. R. Br. at 4.] That conclusory statement about Defendants' conduct, however, does not aid the conflict analysis, because wrongful conduct has not been established.

Plaintiffs suggest that New Jersey has an interest in enforcing its rules of professional responsibility, which Plaintiffs allege that Defendants violated. But Plaintiffs provide no explanation for why Pennsylvania lawyers must abide by rules governing New Jersey attorneys. This factor cannot weigh in favor of New Jersey law.

New Jersey's only connections to this case are that Plaintiffs are a New Jersey law firm, Conway was a New Jersey citizen, and, most significantly, Plaintiffs performed some legal services for Conway there. But Plaintiffs' legal services were performed by an attorney licensed in Pennsylvania operating out of a Pennsylvania sub-office of Plaintiffs' firm, for the handling of matters pending in Pennsylvania courts, as clarified at oral argument. The factors that point toward New Jersey law are outweighed by those pointing toward Pennsylvania law.

In sum, Pennsylvania has a more significant relationship with this case than New Jersey. Thus, the Court will apply Pennsylvania law to these claims.

**iv. Merits of the quantum meruit claim under Pennsylvania Law**

Because Pennsylvania law applies, and because Pennsylvania
does not recognize a cause of action by a terminated attorney
against an unrelated, successor attorney for sharing fees,
Defendant's motion to dismiss Counts I and II will be granted.[7]

## B. Tortious Interference with Plaintiff's attorney-client contract relationship (Count III)

The parties do not allege that there is a conflict between
New Jersey and Pennsylvania law on the issue of tortious
interference with a contract. The Court agrees. The elements of
the tort are the same in both states: (1) the existence of a
prospective economic or contractual relationship between the
plaintiff and a third party, (2) intentional harm to the
plaintiff by the defendant, (3) the absence of a justification

---

[7] At oral argument, Plaintiffs asserted that, in addition to
common law quantum meruit claims under Counts I and II, they have
"charging lien" claims under the New Jersey Attorney's Lien Act,
which were "component[s]" of the quantum meruit claims under
Counts I and II. The complaint makes no reference to the
Attorney's Lien Act. Indeed, while Plaintiffs mention that they
corresponded with Defendants about asserting a "lien" or
"charging lien" in the factual portion of the complaint (see
Compl. ¶¶ 14-15, 19-20, 24), Counts I and II otherwise make no
reference to a New Jersey statute nor a lien of any kind (see
Compl. ¶¶ 30-36). The complaint as a whole does not allege facts
that Plaintiffs have an enforceable charging lien against
Defendants. Counts I and II, fairly read, state a common law
claim for quantum meruit. It is not plainly apparent from the
complaint that Plaintiffs assert any claim under the Attorney's
Lien Act. Insofar as Plaintiffs seek to assert lien claims under
that statute, the Court holds Plaintiffs failed to plead such a
claim properly, under Fed. R. Civ. P. 8(a)(2) (requiring "a short
a plain statement of the claim showing that the pleader is
entitled to relief").

for the defendant's conduct, and (4) the interference must cause some damage. <u>See</u> 4 Standard Pennsylvania Practice 2d § 23:115 (listing the elements and citing state case law); 49 N.J. Practice, Business Law Deskbook § 19:25 (2011-12) (same). As there is no conflict, the Court will apply the law of the forum state, New Jersey.

Count III alleges that Defendants tortiously interfered with Plaintiffs' attorney-client relationship with Conway by: (a) communicating with Conway about the subject of the representation, knowing that he was represented by another lawyer, (b) knowingly violating the Rules of Professional Conduct, (c) falsely advising Conway that he could not return to Plaintiffs for legal representation, (d) causing Conway to become addicted to Oxycodone and other medications, (e) taking advantage of Conway "and his addictive mental state" when they knew, or should have known, he was incapable of making clear or competent decisions, (f) failing to cause a guardian to be appointed or to consult Conway's parents regarding his case, (g) violating a fiduciary duty by referring Conway to a doctor for the purpose of providing Conway with medication, (h) violating a fiduciary duty "generally," (i) settling Conway's claims for less than the appropriate amount,[8] and (k) inducing Conway to terminate his

---

[8] Plaintiff's paragraphs (i) and (j) state the same claim. [Compl. ¶ 37.]

contingency fee with Plaintiffs to defraud Plaintiffs of their contingency fee. [Compl. ¶ 37.]

In other words, Plaintiffs argue that Defendants wrongfully induced Conway to discharge Plaintiffs and retain Defendants, and that Conway did not voluntarily change his representation. [Pl. R. Br., at 2.] "Rather, the Defendants made deceitful promises to Mr. Conway that were made for the express purpose of guiling him away" from the Plaintiff's law firm. [Pl. R. Br., at 2; Statement of Conway at 3-4.] Specifically, Plaintiffs assert that Defendants promised to help Conway get proper medical treatment, but did not follow through. [Pl. R. Br. at 2-3; Statement of Conway at 3-5.] Plaintiffs also assert that Defendants should not have discussed the case at all with Conway, knowing he already was represented. [Compl. ¶ 37(a)-(b).] Finally, Plaintiffs argue that Defendants tortiously prevented Conway from returning to Plaintiffs for legal representation, when Rosen repeatedly told Conway he was not permitted to rehire a firm that he had already fired in a case. [Statement of Conway at 6; Compl. ¶ 37(c).]

**i. Arguments**

Defendants argue that Count III for tortious interference with a contract relationship must be dismissed because Plaintiffs do not "allege facts to establish intentional, improper conduct by any of the defendants which induced Mr. Conway to discharge plaintiffs." [Def. Br. at 11-12.] Defendants argue that the

complaint "does not allege any misrepresentations" made by the Defendants to induce Conway to discharge Plaintiffs, other than to state the conclusion that Defendants "wrongfully induc[ed]" Conway to terminate his relationship. [Id. at 12.] Defendants further argue that some of Plaintiffs allegations, such as the fact that Defendants settled Conway's claims for inappropriate amounts, are irrelevant. [Id. at 12-13.] Finally, Defendants argue that the complaint does not make any specific allegations of improper conduct against Defendants Bleefeld or Moss. [Id. at 14.]

Plaintiffs respond that their tortious interference claim is based on two possible theories recognized by New Jersey courts and articulated in the Restatement (Second) of Torts: that Plaintiffs wrongfully induced Conway to terminate his existing contractual relationship with Plaintiffs, and/or that Plaintiffs wrongfully prevented Conway from returning to Plaintiffs, interfering with Plaintiffs' right to enter into a prospective contractual relationship with Conway. [Pl. R. Br. at 13.] Plaintiffs focus the Court's attention on the "false promises and statements" made by Rosen "on behalf of the Defendants, Rosen, Moss, Snyder and Bleefeld" and the repeated advice to Conway that he could not retain Plaintiffs again as counsel. [Pl. R. Br. at 13-16.]

**ii. Standard for motion to dismiss**

23

As to Count III, there is no conflict between New Jersey and Pennsylvania law,[9] so this Count will apply the forum state's law.

In order to give a defendant fair notice, and to permit early dismissal if the complained-of conduct does not provide adequate grounds for the cause of action alleged, a complaint must allege, in more than legal boilerplate, those facts about the conduct of each defendant giving rise to liability. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). These factual allegations must present a plausible basis for relief (i.e., something more than the mere possibility of legal misconduct). See Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009).

Reviewing a Rule 12(b)(6) motion to dismiss, the Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the plaintiff." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). However, the assumption of truth does not apply to legal conclusions couched as factual allegations or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

---

[9] Pennsylvania also recognizes this cause of action. See, e.g., Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P., 40 A.3d 1261, 1278-79 (Pa. Super. Ct. 2012); Foster v. UMPC South Side Hosp., 2 A.3d 655, 665-66 (Pa. Super. Ct. 2010) (enumerating the elements of the claim, quoting the Restatement (Second) of Torts ¶ 766B). Because both New Jersey and Pennsylvania recognize this claim, and both draw the claim's elements from the Restatement, there is no conflict between the law of these states.

statements." Iqbal, 556 U.S. at 678. The Court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief, so the complaint must contain allegations beyond [merely claiming] plaintiff's entitlement to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

### iii. Discussion

In New Jersey, tortious interference with contractual relations or prospective economic advantage requires either a contractual relationship or a reasonable expectation of economic advantage, even if there is no enforceable contract between the plaintiff and a third party. See Printing Mart-Morristown v. Sharp Elecs. Corp., 563 A.2d 31, 36-37 (N.J. 1989) (defining tortious interference as requiring "a prospective economic or contractual relationship," which "need not equate with that found in an enforceable contract" but which must give rise to some "reasonable expectation of economic advantage"); MacDougall v. Weichert, 677 A.2d 162, 174 (N.J. 1996) (enumerating the elements of the claim, based on the Restatement (Second) of Torts ¶ 766B); see also McCue v. Deppert, 91 A.2d 503, 506 (N.J. Ct. App. Div. 1952) (the "action lies not only for interference with the fulfillment of an executed contract but also for malicious interference with the right to conduct negotiations that might culminate in such a contract"); Louis Kamm, Inc., v. Flink, 175

25

A. 62, 68 (N.J. 1934) ("If a tradesman or merchant is deprived of the business of others through one's wrongful conduct, he has a cause of action for the loss thus sustained, albeit there was no contractual relationship between him and the prospective patrons.").

The interference must be intentional, which is to say that the defendant must know that interference is certain or substantially certain to occur as a result of his or her actions. Dello Russo v. Nagel, 817 A.2d 426, 434 (N.J. Ct. App. Div. 2003) (quoting Restatement (Second) Torts § 766A cmt. e). The interference must be without excuse or justification, meaning the conduct must be both "injurious and transgressive of generally accepted standards of common morality or of law." Lamorte Burns & Co., Inc., v. Walters, 770 A.2d 1158, 1170-71 (N.J. 2001). The interference must cause the loss of the prospective gain or contract, resulting in damage. Printing Mart-Morristown, 563 A.2d at 37.

As an initial matter, the Court agrees with Defendants that the complaint does not allege any facts that can support claims of tortious interference by individually named Defendants Bleefeld and Moss. Because the law firm Rosen, Moss, Snyder & Bleefeld, LLP, is a limited liability partnership, partners cannot be individually liable for the torts of another partner or obligations of the partnership. See 15 Pa. Cons. Stat. Ann. §

8204(a) ("a partner in a registered limited liability partnership shall not be individually liable . . . for debts and obligations of . . . the partnership, whether sounding in contract or tort or otherwise, that arise from any . . . wrongful acts or misconduct committed by another partner . . . ."). Plaintiffs have not alleged any facts that would indicate an exception under § 8204(b) applies in this case. Therefore, Count III will be dismissed as to Defendants Bleefeld and Moss.

The Court also agrees with Defendants that Plaintiffs fail to state a claim that Defendants wrongfully induced Conway to terminate his relationship with Plaintiffs. Taking the facts alleged in the complaint as true, Conway voluntarily approached Rosen for a "second opinion" of his case, and Conway asked Rosen if Rosen could help him find medical professionals to oversee his medication regimen and physical therapy and to refer him to a surgeon. [Statement of Conway at 3-4.] Rosen replied that Conway had a strong case, that he could refer Conway to a surgeon, and that Conway would get the physical therapy he needed. [Statement of Conway at 3.] The Court does not need to accept as true Plaintiffs' unsupported conclusion that these promises were made with malice. Plaintiffs allege no facts that indicate Rosen intended to deceive Conway or that Rosen's statements were given in anything but good faith. Indeed, Rosen followed through on the promise to refer him to medical professionals, and Conway later

27

told Rosen he didn't want to have surgery again. [Statement of
Conway at 5, 8.]

As for Plaintiffs' allegation that Rosen violated the Rules
of Professional Conduct by discussing the case with Conway, the
comment to Rule 4.2 in the ABA Model Rules of Professional
Conduct was amended in 2002 to clarify that a lawyer is permitted
to talk with someone who already is represented but who wants a
"second opinion." See e.g., Philadelphia Bar Ass'n Prof'l
Guidance Comm., Op. 2004-1 (2004), available at
http://www.philadelphiabar.org/page/EthicsOpinion2004-1 (last
visited Nov. 1, 2012) (advising that if a represented client,
dissatisfied with his or her current attorney, approaches a
second lawyer, that lawyer has no obligation to notify the
current attorney of the meeting and may assist the client in
preparing a letter terminating the current attorney). It does not
presently appear that Defendants violated a rule of professional
conduct in this case. Therefore, Plaintiffs fail to state a claim
on the theory that Defendants wrongfully induced Conway to
discharge Plaintiffs.

However, Plaintiffs sufficiently plead a claim for tortious
interference with prospective economic advantage. Taking the
facts in the complaint as true, Conway repeatedly asked if it
were permissible for him to return to Plaintiffs for
representation and Defendant Rosen responded that Conway could

not do so after firing Plaintiffs and retaining Defendants. [Statement of Conway at 6.] Conway asserted that he did not have control of all of his mental faculties as a result of his medication and he brought this to Rosen's attention. [Statement of Conway at 3-4.] Construing these facts in the light most favorable to the Plaintiffs, it is plausible that Defendant Rosen wrongfully prevented Conway from seeking to retain Plaintiffs, knowing that a different response to Conway's inquiries likely would prompt Conway to take his case away from Defendants. There is an aspect of wrongfulness in the sense of giving Conway erroneous advice that he could not go back to the firm he had terminated, which was self-serving of the interests of Defendant Rosen and the law firm, to the detriment of Plaintiffs with whom Conway had a renewed desire to contract. Arguably, that conduct directly cost Plaintiffs the opportunity to enter a contract with Conway, bring his claims to settlement, and earn a fee pursuant to whatever arrangement they would have made with Conway.

Plaintiffs by no means have proved tortious interference with the attachments to its complaint; but Plaintiffs have asserted plausible grounds for their claim that Defendant Rosen and the law firm tortiously interfered with Plaintiffs' prospective economic advantage under the circumstances alleged.

## IV. Conclusion

The Court will deny Plaintiffs' motion to remand for lack of

subject matter jurisdiction.

The Court will grant Defendants' motion to dismiss Counts I and II against all Defendants. The Court will grant Defendants' motion to dismiss Count III against Defendant Bleefeld and Defendant Moss, individually, and terminate Defendants Bleefeld and Moss from the case. The Court will deny Defendants' motion to dismiss Count III, tortious interference with prospective economic advantage, against Defendant Rosen and the Defendant law firm, Rosen, Moss, Snyder & Bleefeld, LLP, but will otherwise dismiss Count III to the extent Plaintiffs asserted that Defendants wrongfully induced Conway to terminate Plaintiffs' services.

An appropriate Order will be entered.


  **s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge

30